Appeals for the 5th Circuit. We have one case on the docket this morning and we'll call that case now. Case number 20-30184, Ernest v. Sanofi US Services. Mr. Mura, we'll hear from you first. Thank you very much, Mr. Court. A litigation-driven test should be closely scrutinized by a district court such that it would be reasonable for a truly independent professional in the field to base an important decision on it. But that is not what happened in this case. In this case, the district court failed to examine the reliability of an expert opinion, which merely offered Sanofi's opinion as its own on a central element of Ernest's claim, causation. A failure to consider an essential element of Dawbert is an abuse of discretion. The court's Dawbert opinion never considers the reliability of the information that Dr. Glaspie based his decision on. It contains no reliability analysis. Neither does it find that Dr. Glaspie was qualified to do the work that he did. It simply sort of hands the ball over and expects that Dr. Glaspie will independently testify that he validated the information, even though, at the Dawbert stage, the court was told that Dr. Glaspie could not validate the information, and at trial, Dr. Glaspie said again and again that he could not validate the information that Dr. Glaspie provided. If that information was wrong, all of his opinions were wrong. He, in fact, if you look at page 11,510 of the Record on Appeal, that's where counsel is asking, during cross-examination, Dr. Glaspie about Table A, which was the information that was given to him. That was a table that showed different follow-up periods for Tax 316, the clinical trial, and those periods were different from the ones that were provided to the FDA and told to the world as part of Sanofi's final 10-year report. And so, he looked at that table, but he testifies there that he never looked at or relied on Kopreski's depositions. So, he simply looked at a table which had different figures. Sanofi could have given him a table that said zero and zero. He would have formed the same opinion. His opinion was based on nothing except the full and wholesale adoption of an opinion that Sanofi had produced for a corporate designee. He never demonstrated at trial or at the Daubert stage why he believed that the estimates that he was relying on were reasonable. He never testified to that. He also never provided a cogent explanation for why he needed to disregard the final clinical trial results that followed patients for a period of 10 years and reported persistent alopecia as being a common side effect. He never explained why he needed to rely on the Kopreski analysis. What he said was that Tax 316 was about permanent or persistent alopecia, but that's incorrect. Tax 316 was looking at whether these conditions were persistent through the follow-up period. The final clinical trial data had a column which said at what point the study investigators had concluded that those individuals had been followed. And so, it's for some, for one in the TAC arm, the taxateer arm, it followed 28 out of 29 for no longer than six months. Counsel, suppose you're right that Kopreski could not testify under 386 the way he did. What else do you have to show to get a reversal here? Do you need to show anything else to show that Glaspie's testimony was inadmissible? I guess that's the first half of the question. And then the second is, suppose you don't need anything else or you can make whatever that showing is to link and rescue Glaspie. What would be the Yes, Your Honor. We don't believe we need to show anything other than the fact that Kopreski should not have testified and Glaspie should not have taken that testimony and imbued it, cloaked it with sort of the expertise that was highly prejudicial to plaintiffs. And that itself is a basis both for abuse of discretion, because the court never considered the reliability of any of this evidence, and also it's never testified about Tax 316. The parties went back and forth about, and the issue that the jury ruled on was causation. And so clearly if you take away Tax 316, which the jury heard is the pinnacle of evidence among all the evidence that was presented on causation. There were also observational studies, there was also case reports, although the jury was told by both sides that case reports are insufficient to show that if it was a district judge's chair, we would have ruled differently on the visibility of it, right? I mean, it's a really high standard. I guess, what would be the best case that you'd have on the fact that this particular evidence here in the state just assumed for the sake of discussion that it is one, would meet that high standard? We agree. The question is not whether the jury reached a correct result or how this court would decide it if it were sitting as a jury. The question is the degree of probability. And the cases that we cited when we discussed substantial error look at the way that the parties gave the testimony. And if you look at the closing argument of Sanofi, Sanofi said, Sanofi's closing argument was that the whole case, the whole case fails because the only person to look under the hood of Tax 316 was Dr. Kopreski. So that's a clear statement from Sanofi that they told the jury that the case would fail, and the jury returned a verdict on causation. It's highly probable that the jury put great weight on exactly what Sanofi was arguing. And there are cases that focus on both what were the closing arguments of the parties. Here, the closing arguments of the parties put great emphasis on Tax 316, and there was a long colloquy where the explanation was the only person to pop the hood to look at this evidence was Dr. Kopreski. The closing argument doesn't even say, and pretty much tacitly acknowledges, that Dr. Glaspie never popped the hood. And even when it said that Dr. Glaspie— If you had your best authority, I think—pardon me. Yes. The most analogous case that you would ask us to apply or extend to this case. Yes, the Carlson case. The Carlson case was a case in which the court failed to scrutinize under Daubert the qualifications of an expert, and the court found that it was reversible error because in that case, the court even noted that the district court had allowed the case to go to the jury because it thought that there was enough evidence to go to the jury. Here, the case went to the jury. There was no Rule 50 motion granted at that stage. It was deferred. And so it's quite obvious that there was enough evidence in our case to support causation. Now, I do think that defendants try to poke holes at our causation evidence, but many of their statements about what the expert said on our side are incorrect. For example, the statements that Toste conceded causation because she said that she could not attribute the hair loss to two drugs, the A and the C. She was saying that she can't attribute the initial hair loss to that, but she can attribute the lack of hair regrowth to the taxatier. So that evidence was clear to the court. Also, they seized on evidence from an expert by the name of Feigl, who testified also. She was asked about strictly the FAC arm, and she said, well, can you know whether it was the A and the C in the FAC arm? And she said no, but on redirect, she explains that this is a comparator study. So the way in which you know it wasn't the A and the C is to look at the two arms. Don't just look at one arm in isolation. The only difference between those two comparator arms is the T and the F, so you know that it's not the A and the C. And in fact, Sanofi has promoted that aspect all for the efficacy. I mean, it obtained the indication for this based on Tax 316. It's now attacking its own study for purposes of one condition. It's never said that publicly. It's never done it elsewhere outside of this litigation, and I don't think it would because if it did, it would be undermining, it would be essentially burning down the house because it would be undermining both the efficacy and the safety arm of the study, which was based on this comparator arm. And finally, there was a statement that Plunkett didn't actually opine on the incidence rate. What Dr. Plunkett said at page 10,295 was that my testimony has to do with an increased risk, which is not always qualitative, but we did not have to have another expert opine on the incidence rates because we had a clinical trial that provided the incidence rate. That incidence rate is repeated again and again in the label. It's still in the label. It refers to alopecia as common, persistent alopecia, which is precisely what we were studying. The jury heard that PCIA, and I think this is an important point because counsel for the other side has represented that permanent is somehow different than persistent, is somehow different than ongoing, and that's not correct. Dr. Toste was asked by counsel for Sanofi in cross-examination about what PCIA means, and she said, by permanent, you don't mean, all you mean is that it lasts longer than six months. And she said, yes, that's what everyone understands permanent to mean in this context. That's what PCIA means, and that's why Tax 316 was such highly relevant evidence. And you look at sort of, if you take one leg of the stool away, if you're asking, did this have, the reversible error standard is very high, you do look to whether the case was somewhat close. And so here, if you have observational studies and case reports which don't, case reports themselves don't establish causation, observational studies can, but then you have the company's own clinical trial data. If you undermine that, you do make the case much harder to go to a jury. So it's quite clear that this had a substantial . . . Well, counsel, let's go back to Dr. Kopreski if we could. So you have Dr. Gillespie say that, well, if his conclusions are wrong, then mine are wrong also. But also, the reverse would be true. Kopreski's conclusions are right, and Gillespie was able to rely on them, then, you know, we are where we are with the jury verdict against your clients. So talk to me a little bit about why it is that Dr. Kopreski's testimony is infirm, because I'm having trouble seeing how he couldn't testify the way that he did. Sure. It's infirm because Dr. Gillespie's testimony about it is guesswork. He has no idea . . . No, no, no. Dr. Kopreski. Let's talk about Kopreski first. Okay. Well, Dr. Kopreski only looked at 55-month data. If you look at . . . But why was he not entitled effectively to summarize the data as related to the litigation based on his prior knowledge as an employee at Sanofi and as the company's representative? Because the litigation is about persisting alopecia. The 10-year study results are the results that reported persisting alopecia. The company spent eight months doing quality control to look at that, and that's not based on 55-month data. It's a 10-year study. And so if you look at . . . I would point the court to page 13,523, which is Gillespie's report. He says the 55-month interim analysis, 22 out of 744 patients were treated in the TAC regime and were recorded as having persistent alopecia, even though he says the study is not about persistent alopecia. Here is the candidate admission that it was. But he's saying 22 out of 744. We know in the next sentence he says the 10-year mark, it was 29 out of 744. What happened was, and you see this in the record site, page 4586, plaintiffs asked an interrogatory to identify the patients at the 55-month period. There were 22. Sanofi went through quality control. Some of those patients dropped out. They added other patients. So you can't just look at the 55-month data to know what the conclusion was of a 10-year study. Sanofi knew that, which is why it never reported at the end of the day the 55-month data or did its analysis based on the 55-month data. Dr. Popresky also did not have case report forms for many of the patients he looked at. He ignored 97% of the patients to the extent that he's saying that out of 14,000 patients, I can look at these 29 and find errors. Well, those errors were cut both ways. He has not examined any of the other patients in the study, which might reveal, if someone did that, might reveal that there were people who should have been counted as having persistent alopecia. And so it's completely unreliable to ignore 97% of the patients in a study and to try to reverse engineer this sort of quality control, which he never participated in when he was at Sanofi. He was not part of the initial production of the results there, and he did not have the forms. He testified under oath that he never looked at information request forms. These are forms that come to the company from a doctor that says, yes, this person was categorized as being resolved, but now it's not resolved, or there are mistakes in the forms. That's why you don't look at just a snapshot in time and an incomplete set of forms of only a handful of people in the 29. There's no protocol that allows for that. Dr. Popresky never said a methodology for why this is reasonable. There's no evidence in the record that this is how experts would analyze this data. If an expert wanted to reanalyze Tax-Free 16, I don't think any expert could sign their name off on this sort of reanalysis. It was litigation-driven based solely on the information provided by the attorneys. If I may—oh. Oh, sorry. You'll still get rebuttal comments. But you don't need to show any of that, do you? Because Popresky was testifying as a 36-year-old. No, we don't. We're focused on—we can establish reversible errors simply by focusing on the fact that Dr. Glaspie came in and testified about this. And, in fact, the instruction that was given that was supposed to cure this only said that Dr. Popresky is not an expert. But it cured nothing, because Dr. Glaspie was an expert, and he was permitted to testify at length about this. So he imbued and cloaked this information with sort of expert authority, even though he could not validate it. And guesswork is never helpful to the jury. The Viterbo case talks about when it's improper to allow this information to get to a jury, and it's when it's not helpful. And a pure guess from an expert is never helpful to a jury in deciding an issue such as causation. And how is that a pure guess? I mean, Dr. Glaspie was familiar with the Tax 316 study as well as it was going on, and he relied on a number of other things besides Dr. Popresky's chart, did he not? He did not. If you look at that page that I mentioned, page 11,510, which is his cross-examination, he's asked whether he relied on the Kopresky deposition, his testimony. He says no. Table A was attached to his report before some of those depositions had even occurred. He has no explanation in that paragraph. Very similar to the Jacked Up case. He has no explanation for why he reasonably thought that it was appropriate to rely on this information. Thank you. You've reserved four minutes for rebuttal. Thank you very much. Ms. Eisenstein, over to you. Good morning, Your Honor. Alana Eisenstein, on behalf of Defendant Apelli Sedoki-Paventis. Your Honor, this colloquial is based on a mischaracterization of both Dr. Kopresky's testimony and Dr. Glaspie's testimony and what the significance was of the Tax 316 data that reported ongoing alopecia. But the key difference there, that Dr. Glaspie knew from his personal experience in designing, in administering, and reviewing the Tax 316 study, and that Dr. Kopresky demonstrated by his review of the documents underlying the 29 case reports that reported ongoing alopecia, was that there was a key difference between ongoing, as reported in the Tax 316 study, and permanent alopecia, according to the definition that plaintiffs sought to use in this litigation. And so you heard Mr. Murrah explain that permanent alopecia has a specific definition. It's one that was fed in their complaint, that was adopted by their experts, and in fact was demanded of Dr. Kopresky as a 30-to-6 witness to report on. Permanent means that the alopecia continues six months or more after the conclusion of the last key survey. Ongoing, however, could be checked on the Tax 316 study of side effects if the report of alopecia continued 30 days after the completion of the last chemotherapy study. And indeed, if the patient was lost to follow-up following that point in time, then the Tax 316 study would not have reflected that resolution. And so what Kopresky did was he described it as a straightforward review of patient case reports, looking at them to determine whether these patient case reports in the 29 listed as ongoing actually met the different definition of permanent alopecia used in this litigation. And he indeed found that the documentation did not demonstrate that it did. Lastly, could you call Kopresky to the stand as a fact witness, hand him Ms. Earnest's medical record, and say, Dear Doctor, you are a world-renowned oncologist. You've been doing this a long time. What do you think about this medical record? Does she have persistent alopecia? Could you do that under Rule 701? I don't think so, Your Honor. I don't think you can either. So how in the world could he then do exactly the same thing times 29 as to every one of the medical records in the Tax 316 study? Your Honor, let me talk about a key difference between what you said happened and what happened here. So what Dr. Kopresky reviewed were what were called case report files. These aren't like a review of a medical record to say, did this person experience this condition? They were reports that were filed as part of the clinical trial. And indeed, Dr. Kopresky, in his role as pharmacovigilance for the company, this was exactly the kind of work that he did. So under the Valencia case, which talked about this kind of very similar type analysis, when it's within the type of work that the employee did in his corporate capacity, he was able to review these documents, which are the same kind of documents he did as a pharmacovigilance employee, and to determine just a yes or no. This was not a deep analysis of what was causation or medical causation, like in the case that Mr. Murrah cited as his best case, where a chiropractor with no medical training was opining on medical causation. This is nothing like that. Dr. Kopresky was simply looking at these case reports, and I'll go to his testimony explaining what he did. This is at the record at 11307 to 371. He explained that he had to review it from the stricter standpoint of the criteria laid out in the litigation. And then at 11376 to 77, he said, I answered two simple questions. One, did we have documentation that the alopecia was present six months after chemotherapy? And then the second, was there evidence, i.e., documentation of the resolution of that alopecia? He wasn't going deeper to say, is there some deeper medical diagnosis here? He's simply saying, is the documentation there, yes or no? If it's so simple, why not have GLASB do it? GLASB was involved in Tax 316. GLASB is a world-renowned oncologist. If it's so easy to just—and it's only 29, we're not talking about thousands or whatever— why not just have the Daubert-qualified expert do it? Well, so your Honor, it would be possible to do it, but the diligence involved in his 29 patients as well as the additional patients and the other arm, the non-taxateer arm of the study he also performed. But keep in mind, these patient case files occurred each and every time that patient went over a 10-year period or more back to the doctor, and these case report files were filed. So it's not just 29 pieces of paper. There's a multiple of that. Kopreski was the one who performed that review of the documentation, and so he produced a summary chart of that that is perfectly proper as both lay opinion testimony and 30 v. 6 testimony as this Court has noted in the Valencia case. I think it's a very similar type analysis there. Well, in that case, I mean, you've got a former corporate officer who's testifying about the occupancy of an apartment building, right? I mean, it's like—and how do you get to $17 million in repair costs or whatever the number was? I mean, it's really different than something where you have someone who you could have qualified under Daubert, presumably, of an oncologist who's—I don't see why you couldn't have gotten Kopreski qualified if you wanted to do it that way. But you can see the risk if you took the two rules together. If you put 30 v. 6 or 701 with a Daubert-esque kind of expert who clearly understands how this stuff works, clearly studied the data, clearly understands the study, but you allow him to testify as a fact witness and then you bootstrap it into a 702 Daubert expert, you run the risk that you end up having non-Daubert-qualified testimony presented by someone in a lab coat that confuses the jury. So let me say a couple points about that, Your Honor. The first is that with respect to Dr. Kopreski, the reliability of the analysis, which is really the centerpiece of the plaintiff's claim here, it is telling that they have, to this point, not pointed to a single case, a single patient, where Dr. Kopreski's review of the documentation was wrong. And, in fact, Dr. Glasby testified to that point. He was asked, point blank, has the plaintiff, and this is at 11579 of the record, has the plaintiff in this case pointed you to one single piece of data in Dr. Kopreski's analysis that was inaccurate? Answer, no. Read the briefs. They pointed to potential areas of inaccuracy, potential ways in which they think his methodology, in their view, could have been better. But they don't actually tell you that there was one of the patients that he analyzed or reported on, really. It's not an analysis. It's really just a straight report where there was documentation that the alopecia was permanent. And this is why, really, it's the plaintiffs that are trying to bootstrap Tax 316 to do something it wasn't, and why Dr. Glasby knew that from his own personal experience and knowledge, his knowledge of the blood and guts, as he said, of the Tax 316 study design. Dr. Glasby is not only a world-renowned oncologist, but he was one of the architects of this study, and he understood from that personal experience the limitations in the study with respect to this side effect. But he also said over and over again that he wasn't testifying, that he was just taking as a granted what he got from Kopreski, so that he wasn't actually doing any of his own analysis. He was just taking the table and straight up giving an opinion on it. The plaintiff keeps liking to point that piece out, and they asked him that repeatedly on cross-examination. He was up front with the fact that he didn't go behind to the raw data, that 703 by its expressed terms does not require an expert to do. If he did not look at the raw data, he did not go back to the patient files. That's for sure. But his ultimate expert conclusion was based on far more than either just even the Tax 316 data and far more than just Kopreski's analysis. But didn't he say, counsel, that if Kopreski's wrong, then my conclusion's wrong also? He said that, but the way in which it was taken out of context is significant. So he explained, and this is, for example, at 11506-07 in the record, that, I admit it, I told you in my deposition if the data in that table is incorrect, then none of my opinions are valid. If the data there is incorrect, and be specific as to what he's talking about, the date of the last visit, the date of the completion of chemotherapy, if these things are correct, my opinions hold, because I'm aware as a clinical trialist how these confusions can arise, and he's discussing the lack of follow-up with respect to alopecia. And the key point that plaintiffs wanted to use Tax 316 for was flawed. They wanted to take these 29 patients in the taxotere arm and compare them to a set of patients in the non-taxotere arm and try to make something of statistical significance that a taxotere was more likely to lead to permanent alopecia than other agents. That's what they wanted to do. But unfortunately, they're using this ongoing alopecia data that doesn't map on to what they're trying to do with it, and that was the key point that Dr. Gillespie was saying, is that, yeah, he said, I know from my own experience that the 29 on the Tax 316 arm, it's got to be less than that. I know it's limited because I know patients were lost to follow-up. I know that there were cases where it was solved and the data wasn't reflected. Dr. Gillespie knew that from his own experience. What Dr. Kopreski did, and this is, I think, helpful from the district court's opinion denying the motion for a new trial, she said, Dr. Gillespie, this is a quote from the district court, simply relied on Dr. Kopreski to specifically illuminate those limitations by analyzing each of the 29 cases. Dr. Gillespie was not required to check every aspect of Dr. Kopreski's work for his reliance on the work to be reasonable. And I think that that's a spot-on analysis of how an expert can properly use the review of the documentation that Dr. Kopreski did to illuminate. He knew it was less than 29, but Dr. Kopreski said how much less because he was able to show on a patient-by-patient basis which ones simply didn't have the documents to show they experienced permanent alopecia in the way in which plaintiffs wanted to use it. And so plaintiffs put on their own expert that just took that 29 for granted. They didn't do the diligence to actually see if ongoing met the definition that they wanted to use it for. So I think you heard Mr. Murrah try to claim that we're trying to attack our own study through Dr. Kopreski or Dr. Gillespie. But Tax 316 wasn't a study designed to study permanent alopecia and the rate of permanent alopecia in patients who received Taxotere. It was the seminal study that demonstrated the efficacy of Taxotere and its life-saving benefits. And as part of that study, it comprehensively looked at 69 different side effects and whether they continued to be ongoing over the course of a 10-year follow-up period. Now, I wanted to make one more point about what Mr. Murrah said about there was some problem with using the 55-month versus the 10-month, and Dr. Kopreski specifically addressed that. If you have patients who the question is whether or not there's documentation six months after they finished chemotherapy and then whether or not that resolved, it makes perfect sense, he said, to use 55-month data because you would know that at that point. Also, that was the data that was submitted to FDA for approval on data that was published. And so, you know, I also think it's notable that all of the documentation that Dr. Kopreski reviewed was given to plaintiffs. They had 25 hours to cross-examine and examine, depose Dr. Kopreski. And here they are not able to identify one that was problematic, not one patient that was problematic. I think that, you know, ultimately, too, when that point goes to the ultimate standard for reversal of a jury verdict. So this is, as Judge Oldham, you pointed out, an extremely high burden. There's multiple layers of deference that apply here. So in the Pettit case, there's not only the abuse of discretion standard that the district court is reviewed for, but there is also the deference that is given under Rule 703 to Dr. Glaspie and his reasonableness in relying on the work that Dr. Kopreski did for this very discrete point, by the way, for a very limited point, not for his causation analysis as a whole. And then there is even, that's just to determine error in the first place, the manifest injustice standard,  that the district court is reviewing. And then there is the deference that is given under Rule 703  did for this very discrete point, by the way, for a very limited point,    Thank you very much. Let me start with this suggestion that we have not pointed out an error. We have. We have pointed out many substantive errors with the analysis of only looking at a snapshot of patients for a 10-year study. And specifically, when I pointed out to the court that there were 22 patients at the 55-month period, some dropped out, some were added, that was because at the 10-year mark and close into that time, Sanofi did a quality control. There were two patients, if you compare the lists in the record, 12-612 patients, 12-403. They were not in the 55-month data. So if you only look at the 55-month data, you are not getting a complete picture of individuals who had persistent alopecia through the end of follow-up. Everyone understood that the study was not following every single individual for 10 years. That was part of the protocol. That's what happens in a clinical study. People fall out, people get sick, people pass away, unfortunately. That's why Sanofi did eight months of quality control to make sure that the 29 were correctly tabulated as 29. To the extent that Sanofi says now that our case is about some other sort of information, it's not about ongoing alopecia. It's entirely about whether alopecia is ongoing and is persistent. The label says that alopecia is persistent. It has the Tax 316 data. But what of counsel's point that the plaintiffs have redefined the terminology from ongoing to permanent? Is that accurate? Are you alleging that it's permanent hair loss, and is that different from the study? That is not accurate, because persistent and permanent alopecia mean the same thing. It just means that it's lasting longer than six months. That came out in a colloquy between Sanofi's counsel asking Dr. Tosti, what do you mean by PCIA? You don't really mean permanent. You just mean that it lasts longer than six months. Sanofi could have pointed out that there was one person in the TAC arm who was not followed for six months, and they could have pointed out that there were two people in the FAC arm who were not followed for six months. But that was a better situation for plaintiffs anyway, because if you take one out of the TAC and one out of the FAC, Tax 316 is statistically significant by itself. Instead, what plaintiffs did is we just took the locked data as its own, because that's sacrosanct. That's viewed as sacrosanct by doctors and by the FDA. You set the terms of the study at the outset. You don't change the terms at the end and reanalyze data. You don't look back at forms and say, well, perhaps this was resolved. I'm going to mark this as resolved, without looking at any data afterwards about whether it was in fact resolved. And the obligation should not be on plaintiffs to point out errors, although we have pointed out errors. The obligation should be on Sanofi, which is the proponent of this evidence, to show that it's valid, to show that it's reliable. And Sanofi cannot show that its analysis is reliable to suggest that what Dr. Kopreski did was just some simple counting of numbers is inaccurate. Every single expert who testified about causation, and causation always requires expert testimony, and this was, in effect, expert testimony. It did not come to us through an expert report and all the protections of Rule 26, which allow us to sort of attack the evidence. Lastly, I'll say Carlson is a great case for us, because there was only one expert there who testified, and that's why it was so important that the court found reversible error. Here you only have one expert. Sanofi only brought one expert. It told the court at the downward stage that it had other experts who could validate Dr. Kopreski's analysis. Sanofi never called those experts. It only called Dr. Glaspie. Thank you very much. Thank you. Case is submitted, and we are adjourned.